CakutheRS, J.,
delivered the opinion of the Court.
This bill is filed by the complainants to assert and protect their title in remainder to twenty-five or thirty slaves, under the will of their uncle, William Bracken, made in 1833, which is in these words:
“I lend to my brother-in-law and' friend Reuben Searcy and his wife Polly, my negro woman Grace, and my negro man Clement, and Grace’s children, to wit, Pat-sey, Honor, Jane, John, and Harriet, during their natural lives; , and at their decease to be equally divided among the children of him, the said Reuben Searcy.”
Bracken left a wife and four children, and an estate of between eight and nine thousand dollars, exclusive of these slaves, then eight in number, and worth about $3000, and including fourteen other slaves.' The said slaves have now increased to twenty-five or thirty, and are held by the various defendants under sales and titles made by Reuben Searcy after his bill of sale to William Bracken in 1827, which the defendants insist was fraudulent. At the time of this conveyance to Bracken by Searcy in October, 1827, the *282 latter was largely in debt, and one of his largest creditors, Daniel MeAuly, had a suit then pending against him, in which judgment was recovered the next year, in February, for $1390. The bill of sale to Bracken purports to be on the consideration of $2000. The proof is very conflicting as to the possession after this date up to the death of Bracken. It seems to have been of a shifting character, and in neither uniformly and continuously; but the preponderance of the evidence is, perhaps, that the negroes were mostly with Searcy and under his control. It is proved that after this conveyance Searcy was regarded as insolvent.
McAuly’s execution was levied upon these negroes soon after the death of Bracken, as the property of Searcy; and a sale of them was enjoined by Searcy and wife, upon the ground that the title passed from him to Bracken in 1827, and that 'the latter had made a valid disposition of them by his will. This bill was dismissed at the hearing in 1838, and an execution for the amount decreed — then upwards of $2000 — and it was levied upon the same negroes, then in the hands of Searcy. They were sold by Searcy, with the concurrence and approbation of the executors of Bracken, and the proceeds applied to the payment of the MeAuly debt.
A vast volume of proof has been taken on both sides, the most of which only serves to enhance the cost; and the case has been very elaborately argued by counsel. In the view we take of it, there will be no necessity for an extended discussion of the facts or legal questions raised in the argument.
It would seem to us to be impossible for any impartial mind to weigh the evidence without coming to the conclusion *283 that the pretended sale to Bracken in 1827 was fraudulent in every sense of the word. It was most manifestly intended by both parties to protect the property against creditors, and hold and keep it for the benefit of Searcy and his family. This is not only left to inference, which would be plain enough from the circumstances, but the witness to the bill of sale, then the overseer of Bracken, who is not successfully discredited, but entitled to credit, proves that such was the distinct avowal and understanding of the parties at the time. But independent of this, the whole transaction and final result lead the mind irresistibly to the same conclusion. "There is no other way, looking to the motives which almost universally actuate men in Such cases, to account for the fact of Bracken’s giving one-third or fourth of his estate, regarding this as a part of it, to collateral relations, when he had a wife and four children of his own to provide for. It is most palpably absurd to argue, in the face of this single fact, if there were no others pointing unerringly to the same conclusion, that Bracken had paid up the consideration of $2000, and thereby made the property his own. Such an idea cannot for a moment be entertained. There is no sufficient evidence that the consideration was ever paid, or that there was any intention to pay it at any time. He perhaps paid a part of it, and for that reserved the negro girl Betsy out of the bequest.
The question then arises as to the effect of the fraudulent character of this sale upon the titles of the parties before us. It is not controverted that the contract was binding upon the' parties, and passed the title from Searcy to Bracken, as between themselves, but not as to creditors. Here the contest is between the legatees of Bracken on *284 the one side, and purchasers for a full and fair consideration from Searcy on the other. A Court of Equity will not extend its relief where the property has passed from the covinous and voluntary grantee to a bona fide purchaser for a valuable consideration, without notice. Where the question is between a bona fide purchaser from the fraudulent or voluntary grantor on the one side, and from the grantee on the other, the preference will he given to the prior title. 1 Story’s Eq., sec. 434. But the case before us does not fall within this principle, because the complainants do not stand upon the meritorious ground of purchasers, but they are merely "voluntary donees or legatees of the fraudulent grantee Bracken, while the defendants have the merit at least of being purchasers for full consideration from the covinous grantor Searcy. ■ These volunteers, claiming without consideration, can surely occupy no higher ground than the testator. Could he have succes-fully invoked a Court of Equity against these defendants holding under a purchase from Searcy ? Would not the Court repel him at once, because of his participation in a fraud, without further examination of his case? Certainly there is nothing better settled in our jurisprudence. Can voluntary claimants under him stand in any better condi■tion ? But it is said that the title of Bracken was cured of all its infirmities, if any existed, by the statute of limitation, running upon a continuous, adverse possession of three years and more by Bracken before his death, and, after that, the possession of Searcy was a continuation of the same title, thus made perfect under the will, which was consistent with that of complainants, as he had the life-estate. So the argument maintains that even if the fraud existed in the first instance, so as to leave the *285 title exposed to the creditors or purchasers of Searcy, it was no longer so after the statute had done its office upon the possession of its vendee. We have heretofore stated that the proof before us did not make out a case of continuous, uninterrupted, adverse holding on the part of Bracken, to give' application to the act of limitations; hut even if it did, we would hold that neither a fraudulent vendee nor volunteers under him can demand the active interposition of a Court of Equity for the declaration or protection of such a title. Whatever the effect might he at law, under the all-curative power of the statute, a Court of Equity will withhold its hands on account of the original taint of fraud in the transaction. Whatever stain was upon the hands of the testator is communicated with the gift to those of his legatees. They cannot, then, he heard to claim the benefit of the statute, or any other right springing out of such corrupt transactions, as complainants in a Court of Chancery. They were therefore correctly repelled by the Chancellor, and we affirm his decree.